## DENNISTON VS. THE UNKNOWN OWNERS, etc.

*Taxation. Fox and Wisconsin river land grants.*

1. By ch. 98, Laws of 1853, and ch. 112, Laws of 1856, the Fox and Wisconsin Improvement Company became the agent of the state to make the improvement of those rivers required by the acts of Congress granting lands to the state for that purpose.

2. Although said ch. 112 contains a conditional grant to the company *in form*, of all said lands then· unsold, this was not to take effect until the execution by the company of a deed of the lands to certain trustees, in trust to secure to the state the application of the proceeds to the making of said improvement and the payment of debts already contracted therefor, and under these circumstances the company took no estate in the lands.

3. The grant and the trust deed were parts of the same transaction, and would operate only as the legislature intended they should operate.

4. Under this act the state was not divested of its title to the lands so as to render them liable to taxation, under the general laws of the state, while the legal title remained in such trustees.

5. Land not sold by the trustees before 1866 was therefore not liable to taxation in 1863.

APPEAL from the Circuit Court for *St. Croix* county.

Action by the holder of a tax deed to quiet the title to a large number of parcels of land described therein.

These lands were a portion of a large body of lands granted by congress to this state, to aid in the improvement of the navigation of the Fox and Wisconsin rivers. The only question involved is, whether the state had parted with the title so as to render them subject to taxation in 1863, when the taxes for

which they were sold were assessed; and the pleadings raising that issue and the facts bearing upon it, sufficiently appear in the opinion.

The action was commenced in June, 1868. The several owners of the lands appeared and answered, and the action was tried by the court, and judgment entered in favor of the plaintiff, in October, 1868. The defendants appealed.

*Stevens, Flower & Morris,* for appellants, contended that the title to the lands in question, which became vested in the state as trustee by the acceptance of the grant and the selection of the lands, remained so vested at the time of the tax sale in 1864, unless it had passed from the state by the act of 1853 (chap. 98), or by that of 1856 (chap. 112), and the proceedings had under them. No proceedings affecting the land were had under the act of 1853; and none under that of 1856, except the execution of the trust deed by the Fox and Wisconsin Improvement Company, until 1866, three years after the tax sale, when the trust and judicial sale was had under which the appellants acquired their title. Under the act of 1853 that company acquired no title, but merely the right to acquire title by the deposit of stocks or the payment and surrender of state indebtedness. The provision requiring the company to surrender state indebtedness, in order to select and acquire lands, is waived and not continued by the act of 1856, without any consideration moving from the company to the state. If the title became absolutely vested in the company by that act, the lands became immediately subject to a $500,000 mortgage, given by the company on all its property then owned and thereafter to be acquired by grants from the state or the United States for the completion of the improvement, which, with taxes, would have consumed them. It cannot be presumed that such was the intention of the legislature.

The act of 1856, granted the lands to the company, but required them *eo instanti,* before the law should take effect, to execute a deed of trust of the whole property. The grant and

the trust deed were parts of the same transaction, and in contemplation of law took effect at the same moment. The company acquired no beneficial interest or power to use, sell, or mortgage, or to charge existing mortgages thereon. *Rees v. Ludington*, 13 Wis., 276. The trustees, to whom the trust of applying the lands to the improvement was delegated by both the state and the company, were appointed by the governor, with the consent of the company, and were trustees for both; for the state to the extent of the lands granted, and for the company to the extent of the property conveyed by it. *Butler v. Mitchell*, 15 Wis., 355. Being state officers, and having only the rights expressly given by the trust deed, the balance of the interest remained in the state. That interest is, in section 3 of the act, called "the prior lien of the state;" and, section 10 provides for the conveyance to the company of "the interest of the state in said lands," when the purposes of the act are accomplished. These lands were appropriated by Congress for a particular purpose and *no other*, and they were granted to the company "subject to the trust and conditions of said grants by Congress," and it was not competent for the legislature to make them subject to taxation, and thus divert them from that purpose. Even Congress could not divert them to any other purpose. 13 Peters, 498; *Barclay v. Howell, Lessee*, 6 id., 498; *Minnesota v. Bachelder*, 1 Wall., 109; *McGee v. Mathis*, 4 id., 143; *Risley v. Farwell*, 4 Chand., 106; *Douglass v. Hastings*, 11 Wis., 448; *Constitution of Wisconsin*, art. viii., sec. 12. Taxation is diversion, and may exhaust the property. *Jones v. Keep's Estate*, 19 Wis., 369; *Taylor v. Davis*, 22 Wis., 229.

The state has no power to tax the means employed by the general government to execute its constitutional powers. *McCulloch v. Maryland*, 4 Wheat., 316; *Sayles v. Davis*, 22 Wis., 229. It cannot tax lands appropriated by congress to the use of Indians. *New York Indians*, 5 Wall, 761; *Kansas Indians*, id., 737.

The state, as trustee, cannot be permitted to obtain any ben-

efit to itself at the expense of the *cestuis que trust.* *Sloo v. Law,* 3 Blatch., 459. By issuing certificates of indebtedness, made a charge upon these lands, the state had practically mortgaged them, and to diminish the security by taxing them would be a breach of the contract between it and the holders of the certificates, as well as of the contract created by the terms of section 9 of the act of 1853, that, " until the said improvement is complete, no part of said grant shall be diverted to any other object." *Neustadt v. Ill. Cent. R. R. Co.,* 31 Ill., 184; *B. and M. R. R. Co. v. Hayne,* 19 Iowa, 137; *Stryker v. Polk Co.,* 22 id., 131; *H. & St. J. R. R. Co. v. State,* 37 Mo., 265; *Des Moines N. & R. Co. v. Polk County,* 10 Iowa, 1; *Tallman v. Treasurer of Butler county,* 12 id., 531, 536.

At the time these lands were taxed the state had such an interest in them as to render them not liable to taxation. They were expressly exempted by section 4 of the act of 1853, until sold by the company, such exemption not to continue longer than ten years. That exemption applied to lands thereafter to be located, which the governor was by that section directed to secure, as well as to those previously selected. 8 Op. Att'y Gen., 246, 247, 255, 390; *Allison v. Halfacre,* 11 Iowa, 450; *Foley v. Harrison,* 15 How. (U. S.), 447; *Van Valkenburg v. McCloud,* 21 Cal., 330. These lands were all selected under the act of Congress of 1846, of which that of 1854 may be regarded as an act of confirmation, taking effect as of the date of the original act. *Leese v. Clark,* 18 Cal., 535. The act of 1856 contains nothing repealing the exemption clause in that of 1853; but it expressly continues in force all the provisions of that act which are consistent with it, excepting one. The exemption did not expire until at least ten years from the date of the act, more than one month after the tax in question was assessed.

The act of 1861 did not make these lands taxable on and after 1863. It was not designed to take effect until after a sale under the trust deed, which did not take place until 1866.

*H. C. Baker* and *John C. Spooner*, for respondent.

The lands selected under the grants vested in the state of Wisconsin in fee simple, and the United States no longer had any interest therein. *Veeder v. Guppy*, 3 Wis., 502. By the terms of the act of 1853, the company acquired all the right, title and interest of the state in the works of improvement and their appurtenances, the state taking as security for the completion of the improvement, the individual bonds of the members of the company. The lands were granted upon condition, the company having the right to acquire absolute title only upon transfer of United States or state stocks, or deposit of certificates of indebtedness outstanding against the improvement fund. This condition in the grant was simply an additional security to the state. The act of 1856 changed the policy. Its terms are those of present grant. It is an absolute conveyance upon the one condition that the trust deed be made. It vested the legal title in the company on the performance of that condition. The title of the trustees proceeded from the company, and was really the title of the company. The fact that they were to act for the security of the state does not involve the existence of any lien in its favor upon the lands. Its security for the faithful application of the avails of the lands was in the supervision of the trustees. The exaction of this security was not inconsistent with a conveyance of all the interest of the state to the company. The state had no interest or lien by reason of the certificates of indebtedness, they being not a state debt, but simply charges upon the improvement fund, and representing the interest of the holders in such fund. The state, being bound in honor to see them paid out of the fund, made them a prior lien thereon. The state had no interest in the lien of the holders of the bonds of the company, for the payment of which also, the trustees held the lands as security. None of the interests which the trust deed was designed to protect were of such a character as would preclude the exercise of the taxing power under the general laws of the state.

The state could convey the lands absolutely without a violation of its trust; and as between it and the company or those claiming under it, the transfer would be valid whether security was exacted or not. The defendants, claiming title under the company cannot raise the question of a breach of trust on the part of the state. The United States are the *cestuis que trust*, and they alone can call the state to account for such a breach. *Baker v. Gee*, 1 Wall., 333. These lands were not expressly exempted from taxation. Such an exemption must be clearly expressed and cannot be implied. Section 4 of the act of 1853 applies simply to the lands which the company *did acquire*, not to those they could have acquired by the surrender of certificates of indebtedness. These lands never passed to the company until the act of 1856 was enacted. If the exemption be considered as applying to the lands embraced in the original grant, and those authorized by the act of 1854, to be selected to make up deficiencies, still it could not apply to these additional lands, acquired under the resolution of 1855. These lands were without the three mile limit of the original grant, and, therefore must have been selected under the grant of 1854, or that of 1855, and the defendants, in order to maintain their defense, were bound to show, but have not shown, that they were selected under the act of 1854.

LYON, J. The plaintiff claims to be the owner of a large number of parcels of land in the county of St. Croix, containing in all nearly seven thousand acres, by virtue of a certain tax deed dated March 27, 1868, executed to him by the clerk of the board or supervisors of that county, and which deed was duly recorded on the 30th day of June, 1868. These lands were assessed for taxation in the year 1863, were returned delinquent to the county treasurer for the taxes of that year, and were duly sold by him in 1864. The deed thereof to the plaintiff was executed upon the surrender by him of the treasurer's certificates of such sale. Such deed, and all of the proceedings prior thereto, seem to be in regular form.

This action was brought by the plaintiff, under the statute, for the purpose of barring the former owners of the lands described in such tax deed, and those claiming under them, of all right, title, interest or claim in such lands. The complaint sets out the tax deed, and is in the usual form of complaints in such actions.

The action is in form against "the unknown owners" of the lands affected by it, and service of the summons was made by publication thereof pursuant to the statute. The former owners of all such lands, each of whom owned a portion thereof in severalty, appeared and severally answered the complaint, except that the trustees of the estate of a deceased former owner answered jointly as such trustees. Each answer contained, amongst other things, an averment that none of the lands to which it relates were liable to taxation in 1863 ; and each answer also contains a full and detailed statement of the facts hereinafter stated in support of such averment.

Concerning those facts there is no contest between the parties. It is conceded that all of the lands in controversy were granted by the United States to this state to aid in the improvement of the Fox and Wisconsin rivers, and that the defendants are severally the owners of the lands claimed by them respectively, unless their title thereto has been divested by such tax deed.

The circuit court held that the tax deed was valid, and gave judgment for the plaintiff in accordance with the prayer of the complaint. The defendants have all appealed therefrom to this court.

From this brief statement of the case it is apparent that the controlling question to be determined is, Were the lands in controversy liable to taxation in 1863 ?

It is quite unnecessary to give a detailed history of the legislation by congress and in this state concerning the lands granted to the state to aid in the improvement of the Fox and Wisconsin rivers. It is sufficient to say that when chap. 112 of the general laws of 1856 was enacted, the title to the land in con-

troversy in this action was in the state of Wisconsin, as trustee for the purposes expressed in the several acts of congress making such grant. It is conceded that, until the law of 1856 was enacted, the lands were not taxable. Did they become liable to taxation by virtue of that law? If so, they were properly assessed in 1863. If not, inasmuch as their *status* remained unchanged until 1866, except as it was affected by the act of 1856, they were not taxable in 1863.

The act of 1856 granted to the Fox and Wisconsin Improvement Company all the lands then unsold which had theretofore been granted by congress to the state, in aid of such improvement, of which the lands in controversy were part, but subject to certain conditions; one of which conditions was, that within ninety days after the passage of the act the company should make a deed of trust to three trustees, to be appointed by the governor with the assent of the company, conveying such lands so granted to the company by the state, and all other property, rights and franchises belonging to the company, to such trustees and their successors, in trust for certain uses and purposes therein expressed, amongst which are the following; 1st. To secure *to the state* the faithful application of all moneys arising from the sale of such lands to the construction and completion of the works of improvement contemplated by the act as therein provided, and to the payment of all outstanding unpaid evidences of indebtedness issued on the part of the state for or on account of said improvement, and interest thereon. 2d. For the payment of any bonds theretofore issued, or that might thereafter be issued by the company, on account of the improvement; and 3d. A certain trust relative to the improvement of the Wisconsin river. The fourth section of the act gave the trustees power to sell the land on the requisition of the company, but under stringent restrictions to secure the application of the proceeds to the uses and trusts created by the act. It does not appear that this power was ever called into requisition, or that any land was sold under it.

The company executed the trust deed required by the act, to trustees duly appointed, and the title to the lands described in the complaint remained thereafter unchanged, until the same were sold by the trustees in 1866, pursuant to a decree or judgment of the circuit court for the county of Fond du Lac, and pursuant also to certain other provisions of the act of 1856.

Did the act of 1856, and the trust deed executed by the company pursuant to the requirement of that act, divest the state of its title to these lands, so as to render them liable to taxation under the general laws of the state?

When that act was passed, the state held these lands charged with the trust that the proceeds thereof should be applied to the improvement of the navigation of the Fox and Wisconsin rivers and uniting them with a canal at or near the portage, and to no other purpose, and the state was restricted by the terms of the grant from making sales of the land any faster than the work on the improvement progressed.

The state attempted to make the improvement by appointing a board of public works to supervise and carry it on. This was in 1848. The plan was a failure, and in 1853 was abandoned, but not until an indebtedness to quite a large amount had been contracted on account of the improvement. In 1853 the legislature granted the unsold lands so held by it in trust to the Fox and Wisconsin Improvement Company, on condition that the company should only have the title to the lands they paid for at the rate of one dollar and twenty-five cents per acre, which payment might be made to the state treasurer in outstanding evidences of indebtedness against the improvement funds, or in United States or any state stock at their market value. The company undertook to pay off all such indebtedness, and complete the improvement, pay all indebtedness of the state as trustee on account thereof, settle with and pay contractors, etc.; and the stockholders of the company were required to give bonds to the state in the sum of $25,000 each, conditioned for the performance of such agreements and covenants

of the company within three years from the passage of the act. The original grant by congress was made in 1846, and did not include the lands in controversy in this action.

But by another act passed in 1854, and by an explanatory resolution of congress, approved March 3d, 1855, the grant was largely increased; and, under the last act and resolution, the title to the lands described in the complaint became vested in the state, but subject to the same trusts, and the same restrictions upon the sale thereof, as were the lands granted by the act of 1846.

When the act of 1856 above mentioned was passed, the time limited for the Improvement Company to complete the work and to pay and discharge the debts and liabilities against the improvement fund, had expired, and the work remained unfinished, and the debts unpaid.

In disposing of the additional land granted to the state, it is natural to suppose that the legislature intended to secure the accomplishment of these most desirable objects. It must be presumed that by the act of 1856, the legislature intended to so dispose of these lands as to secure the completion of the work as soon as practicable, and also the payment of all lawful claims and demands against the improvement fund. In no other way could it fully discharge its obligations to the United States, which it had voluntarily assumed.

The state must perform its functions through the instrumentality of duly appointed officers and agents. In this way alone could it improve the navigation of these rivers, and unite them by a canal. By the acts of 1853 and 1856, the Fox and Wisconsin Improvement Company became the agents of the state to make the improvement required by the act of congress granting these lands to the state. The legislature was willing that the company should have all of the lands so granted to the state, when it should perform its contract with the state, and not before. It did not propose to pay the company in advance. But, for the purpose of guaranteeing performance by

the state, and securing the prompt conveyance of these lands to the company when it should lawfully be entitled thereto, the act provides for the appointment of other agents, to wit : the three trustees, above mentioned, to make a conveyance of the lands to the company when it should have fully performed its contract with the state, or to sell and convey the lands and apply the proceeds for the benefit of the state and of all parties interested therein, as provided in the act and in the trust deed executed by the company pursuant thereto.

To accomplish these objects it was not necessary to vest the title to the lands in the company or the trustees. In view of the obligations of the state to the United States in respect to the original grant it was not wise to do so. That the legislature did not intend to divest the title of the state by the law of 1856, is apparent from certain provisions contained therein. Sec. 10 provides, among other things, as follows : " When all the purposes of this act are accomplished, *and not before*, the said trustees shall convey to the company *the interest of the state in the said lands*, work and other property herein mentioned." The record shows that the purposes of the act were not all accomplished until long after 1863.

Again, it is enacted in sec. 15, that the provisions of the Revised Statutes relating to. trusts, trustees and trust estates, shall not be applied to the trusts provided for in that act. It seems quite clear that by this provision the legislature intended to guard the state against any claim that might be made, that the act divested the title of the state by applying to the act, and the trusts which it created, the statutory doctrine of uses and trusts.

Construing the law of 1856, and the whole of it, in the light of the obligations of the state to the general government, and with a due regard to the circumstances which led to its enactment, and the objects designed to be accomplished by it, we are satisfied that the legislature did not intend to divest the title of the state to the lands in controversy, but that it only intended to

confer upon the trustees a power in trust in relation thereto, leaving the title and ownership of the state intact.

We are also of opinion that the act fully carries out the intention of the legislature in that behalf.

It is true that a conditional grant, in form, was first made to the company, but it did not take effect until the execution of the trust deed, which instantly passed the same to the trustees. No principle is better settled than that the company, under such circumstances, took no estate in the lands. The grant and the execution of the trust deed are parts of the same transaction, and can operate only as the legislature intended that they should operate. *Rees v. Ludington*, 13 Wis., 281.

Upon the whole case, we are of the opinion that the legal effect of the act of 1856 is precisely the same that it would have been had it simply authorized the commissioners of the school and university lands, or any officer or agent of the state, to sell the lands in controversy, and apply the proceeds of such sales to the uses and purposes specified in the act. Had the act so provided, no one would contend for a moment that the commissioners, or officer or agent thus authorized would thereby take any estate or beneficial interest in the lands. In such case the state would continue to be the owner of the lands, although other parties might have an interest in the proper application of the proceeds thereof.

We conclude, therefore, that the state was the owner of the lands described in the complaint in 1863, and that the same were not liable to assessment and taxation in that year.

These views render it unnecessary to consider the question of the right of the state to subject the lands to taxation before the trusts upon which the same were granted by congress to the state were fully executed.

*By the Court.*—The judgment is reversed, and the cause remanded with directions to the circuit court to dismiss the complaint.